IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DEPARTMENT OF EDUCATION,
STATE OF HAWAII,

         Plaintiff

        vs.

L.K. and W.L., on behalf of their
minor child, R.L.,

        Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL NO.  05-00616 JMS/BMK

ORDER DENYING IN PART
PLAINTIFF'S MOTION TO
REVERSE HEARING OFFICER'S
DECISION AND ORDER AND
REMANDING CASE TO HEARING
OFFICER

ORDER DENYING IN PART PLAINTIFF'S MOTION TO REVERSE
HEARING OFFICER'S DECISION AND ORDER AND REMANDING CASE
TO HEARING OFFICER

## I.  INTRODUCTION

Plaintiff Department of Education, State of Hawaii ("DOE"), seeks

reversal of the administrative Hearing Officer's Findings of Fact, Conclusions of

Law and Decision (hereinafter, "Decision") regarding the education of R.L.  The

Hearing Officer concluded that the DOE failed to provide R.L. with a Free

Appropriate Public Education ("FAPE"); the Hearing Officer's Decision, issued

August 26, 2005, ordered the DOE to pay for R.L.'s tuition at a private school for

a year and a half, along with a psychological evaluation, an assistive technology

evaluation, and compensatory education including a tutoring program and two years of private school tuition. The Plaintiff appeals this ruling, arguing that the Individualized Education Plan ("IEP") offered by the DOE satisfied the IDEA's requirements. The Plaintiff argues, inter alia, that the Hearing Officer's reasoning was flawed and that the Hearing Officer erred in awarding two years of compensatory education. The Defendants, in response, have filed a counterclaim seeking attorney's fees and a declaration confirming the Hearing Officer's Decision.

The court concludes that the Hearing Officer was correct in determining that the DOE's IEP did not offer R.L. a FAPE. The court further concludes that the Hearing Officer's order of tuition reimbursement for the period January 2005 through June 2006 was appropriate and that the DOE shall reimburse R.L.'s parents no later than August 4, 2006. Therefore, the court DENIES IN PART the Plaintiff's motion. Nevertheless, the court sua sponte REVERSES the Hearing Officer's award of expert witness fees in light of *Arlington Central School District Board of Education v. Murphy*, No. 05-18, ___ S. Ct. ___, 2006 WL 1725053, slip. op. at 1 (June 26, 2006); the court REMANDS the case to the Hearing Officer to determine whether the psychological evaluation of R.L. is an impermissible expert witness fee or whether reimbursement for the

evaluation is permissible under the IDEA.  The court further concludes that the

Hearing Officer's Decision does not contain specific findings regarding the award

of compensatory education and therefore REMANDS the case to the Hearing

Officer for specific findings as to R.L.'s needs for compensatory education.  The

court DENIES WITHOUT PREJUDICE the Defendants' request for attorney's

fees as premature.

## II.  BACKGROUND

A.    Legal Background:  The IDEA

> In 1975, Congress passed what is now known as the
> Individuals with Disabilities Education Act ("IDEA"), 20
> U.S.C. § 1400 et seq., in response to a finding that more than
> half of the nation's eight million children with disabilities were
> not receiving appropriate educational services.  *Porter v. Board
> of Trustees of Manhattan Beach*, 307 F.3d 1064, 1066 (9th
> Cir.2002).  Pursuant to the act, known then as the Education of
> All Handicapped Children Act ("EHA"), Congress
> appropriated federal funds for state special education programs
> and made them available on the condition that states implement
> policies assuring for all children with disabilities a "free
> appropriate public education," or "FAPE."  *Id.*; 20 U.S.C. §
> 1412(a) (establishing right to a free appropriate public
> education).

*Melodee H. v. Dep't of Educ.*, 374 F. Supp. 2d 886, 890-91 (D. Haw. 2005).  *See*

*also Kletzelman v. Capistrano Unified Sch. Dist.*, 91 F.3d 68, 69 (9th Cir. 1996)

(stating that the IDEA "confers upon disabled students an enforceable substantive

right to public education in participating States, and conditions federal financial assistance upon a State's compliance with substantive and procedural goals of the Act") (citations and internal quotation signals omitted); *Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir. 1995) ("The IDEA's broad mandate to provide handicapped children with a free appropriate public education designed to meet the unique needs of each handicapped child is fairly imprecise in its mechanics.  This vagueness reflects Congress' clear intent to leave educational policy making to state and local education officials.").

FAPE ("free appropriate public education") is defined in 20 U.S.C. § 1401(9) as:

special education[1] and related services[2] that--

---

[1] "Special education" is currently defined in 20 U.S.C. § 1401(29) as follows:

The term "special education" means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including--

**(A)** instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and

**(B)** instruction in physical education.

This definition became effective on July 1, 2005.  Prior to this date, the initial paragraph referred to "specifically designed instruction," rather than "specially designed instruction."

[2] "Related services" is defined generally by 20 U.S.C. § 1401(26)(A) as follows:

The term "related services" means transportation, and such

(continued...)

(A)    have been provided at public expense, under public supervision and direction, and without charge;

(B)    meet the standards of the State educational agency;

(C)    include an appropriate preschool, elementary, or secondary education in the State involved; and

(D)    are provided in conformity with the individualized education program required under section 1414(d) of this title.

The FAPE to which a disabled child is entitled under the IDEA is not the absolute best or "potential-maximizing" education.  *Bd. of Educ. of Hendrick Hudson Cent. School Dist. v. Rowley*, 458 U.S. 176, 197 n.21 (1982).  Instead, states are obligated to provide a basic floor of opportunity through a program individually designed to provide educational benefits to the disabled child.  *Seattle*

---

(...continued)

developmental, corrective, and other supportive services (including speech-language pathology and audiology services, *interpreting services*, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, *school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child*, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

(Emphases added.)  The emphasized sections were added effective July 1, 2005; the prior version of this definition did not include the emphasized sections but was otherwise identical.

*Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996); *Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 587 (9th Cir. 1992). The "basic floor of opportunity" provided by the IDEA consists of access to specialized instruction and related services. *Seattle Sch. Dist., No. 1*, 82 F.3d at 1500 (quoting *Rowley*, 458 U.S. at 201). The basic floor, however, is more than merely providing a program that produces some minimal academic advancement, no matter how trivial. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001).

The FAPE required by the IDEA must be tailored to the unique needs of the disabled child by means of an "IEP." *Rowley*, 458 U.S. at 181; *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993). An IEP, or Individualized Education Plan, is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(11). *See* 20 U.S.C. § 1414(d)(1)(A) (setting forth specific requirements of IEP); *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1461 (9th Cir. 1996) ("Crafted annually by the child's teacher, her parents, a representative of the school district, and, where appropriate, the child, the IEP ensures that the child's education is tailored to her individual needs.").

Additionally, the IDEA requires states to develop procedures to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a FAPE. 20 U.S.C. § 1415(a). These procedures include an opportunity to present complaints relating to the identification, evaluation, or educational placement of a child, as well as an opportunity to contest the school district's contention that it has provided a FAPE to that child. 20 U.S.C. § 1415(b)(6). When a complaint is made pursuant to § 1415(b)(6), "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing." 20 U.S.C. § 1415(f)(1)(A). An aggrieved party can thereafter appeal the hearing officer's determination to a federal district court. 20 U.S.C. § 1415(i)(2)(A).

B.    Factual Background: R.L.

R.L., born on September 10, 1989, has had trouble with reading and other language skills, and has had various behavioral problems (such as aggressiveness and inattentiveness) since he was young. Decision at 3-4. R.L. attended public schools from kindergarten through fifth grade. Decision at 4. In second and fourth grades, R.L.'s teachers requested that he be evaluated for special education services, but he was not found eligible for these services until he was in fifth grade: in 2000, he was identified as having a Specific Learning

Disability based on his difficulties with reading comprehension and written expression.  Decision at 3-5; *see also* Administrative Record on Appeal ("ARA") Doc. # 15, Ex. 4 at 14-15.  In sixth grade (2001-2002 school year) and the fall of seventh grade (fall 2002), R.L. attended a private school.  Decision at 4.  In January 2003, in the spring of his seventh grade year, R.L. returned to public school.  Decision at 4-5.

On April 1, 2003 -- nearly three months after returning to public school -- DOE evaluated R.L. and found him eligible for special education services pursuant to his Specific Learning Disability.  Decision at 5.  The DOE did not, however, develop an IEP for R.L. at this time.  In October of 2003, R.L.'s eligibility for special education was changed from Specific Learning Disability to Emotional Disturbance[3] because "the state of [R.L.'s] emotional well-being is the

_____

[3] Hawaii Administrative Rules (HAR) 8-56-20, entitled "Emotional Disturbance," provides:

> (a)   A student shall be eligible under the disability category of emotional disturbance if the student exhibits one or more of the following characteristics over a long period of time and to a marked degree that adversely affect the student's educational performance:
>
> > (1)   An inability to learn that cannot be explained by intellectual, sensory, or health factors[.]
> >
> > (2)   An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
> >
> > (3)   Inappropriate types of behavior or feelings under normal circumstances.

(continued...)

primary barrier to his performing successfully in the classroom and relating to others at home and at school."  ARA Doc. # 15, Ex. 5 at 17.

The DOE did not create an IEP for R.L. until March 16, 2004 -- a year and two months after R.L. returned to public school.  By that point, R.L. had begun ninth grade at the public high school.  ARA Doc. # 14, Ex. 8; Decision at 5.[4]  The March 16, 2004 IEP included specific goals for language and mathematics, but did not include any mental health goals or short-term benchmarks -- despite R.L.'s continued categorization as having Emotional Disturbance.[5]  ARA Doc. # 14, Ex. 8 at 69-75.

Beginning in the fall of 2004, R.L. began a "downward spiral of failure, loss of self-esteem, and trust."  Decision at 6; Transcript ("Tr.") Vol. 1 at

---

(...continued)

> (4)    A general pervasive mood of unhappiness or depression.
> (5)    A tendency to develop physical symptoms or fears associated with personal or school problems.
>
> (b)    Emotional disturbance includes schizophrenia. Emotional disturbance does not apply to a student who is socially maladjusted, unless it is determined that the student has an emotional disturbance.

[4] Paragraph 11 of the Decision states that an IEP was developed for R.L. "On March 16, 2003 of his 8th grade year."  Decision at 5.  The court believes that this is a typographical error and finds that the date should be March of 2004, not 2003.  R.L. was in eighth grade in March 2004, not March 2003; furthermore, while the DOE developed an IEP in March of 2004, the court did not find any indication in the record that the DOE developed an IEP in March of 2003.

[5] The March 16, 2004 IEP included 120 minutes a week plus 120 minutes a month of counseling, but did not list any mental health goals.  ARA Doc. #14, Ex. 8 at 77.

180-87.  R.L. was frequently absent from school and was failing his classes; R.L. was also subjected to verbal and physical harassment by his classmates.  Decision at 7.

On December 2, 2004, the DOE created a new IEP for R.L.  This IEP included career and life skills goals, such as "[i]dentify negative feelings about himself and identify the causes of each feeling 85% of the time."  ARA Doc. # 14, Ex. 4 at 47-48.  The December 2, 2004 IEP also increased R.L.'s special education services from 220 minutes a week to 600 minutes a week.  The DOE continued to categorize R.L. as having an "Emotional Disturbance" rather than a learning disability that caused emotional problems.  *See* ARA Doc. # 14, Ex. 43.

On January 4, 2005, the DOE held an emergency IEP meeting at R.L.'s mother's request.  Decision at 10.  The IEP team decided to re-evaluate R.L., keeping the December 2, 2004 IEP in place (but allowing R.L. to take all his classes in the school's tutoring center) while the re-evaluation took place. Decision at 11.  R.L.'s parents removed him from public school in January of 2005 and placed him in a private school.  ARA Doc. #14, Exs. 39-40.

On March 3, 2005, the DOE created a revised IEP for R.L.  This IEP did not change R.L.'s goals or objectives, although it did increase R.L.'s special education from 600 to 900 minutes per week. ARA Doc. # 15, Exs. 6, 9.  The IEP

team "determined that [R.L.] remained eligible for special education and related services under the category of emotional disturbance." Decision at 16. The DOE, from October 2003 through March 2005, consistently found that R.L.'s emotional disturbance, rather than a specific learning disability, was the reason that R.L. was entitled to special education services.

On May 18, 2005, R.L. (by and through his parents) filed a Request for Due Process Hearing against the DOE. Decision at 2. R.L.'s parents alleged that the DOE had violated the IDEA by failing to provide R.L. with a FAPE. Decision at 3. The Hearing Officer heard six days of testimony between June 27, 2005 and July 6, 2005. On August 26, 2005, the Hearing Officer issued her Decision. The Decision, twenty-seven pages in total, contains 54 paragraphs of factual findings spanning eighteen pages. The Hearing Officer relied heavily on the testimony of Peggy Murphy-Hazzard, Psy.D., the neurospsychologist/clinical psychologist who conducted a neuropsychological evaluation of R.L. *See* Decision at 14-20; Tr. Vol. 5 at 927, 938-39.

The DOE filed its Complaint with the court on September 23, 2005, and on March 20, 2006, the DOE filed its Opening Brief. The Defendants filed their Answering Brief on April 4, and the court heard arguments on May 22, 2006. Both parties declined to present additional evidence at the May 22 hearing.

11

### III.  <u>STANDARD OF REVIEW</u>

The IDEA provides that "[a]ny party aggrieved by the findings and decision" of the hearing officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A).

The IDEA requires the following of the court:

In any action brought under this paragraph, the court--

(i)  shall receive the records of the administrative proceedings;

(ii)  shall hear additional evidence at the request of a party;[6] and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C).[7]  In *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 206-07 (1982), the

---

[6] Neither party requested that the court hear additional evidence in this case.

[7] Prior to July 1, 2005, this particular provision was codified at 20 U.S.C. § 1415(i)(2)(B).

Supreme Court explained the court's role in reviewing an administrative decision

in an IDEA case:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought.  The fact that § 1415(e)[8] requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings. And we find nothing in the Act to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself.  In short, the statutory authorization to grant "such relief as the court determines is appropriate" cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress.
>       Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold.  First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

---

[8] This provision now appears at 20 U.S.C. § 1415(i).

(Footnotes omitted.) (Final alteration in original.) *See also City of Chi. v. Int'l College of Surgeons*, 522 U.S. 156, 171 (1997) (citing *Rowley* for the proposition that the IDEA "contemplates deferential review of state administrative action").

The Ninth Circuit has clarified the court's role in reviewing a hearing officer's decision in an IDEA case:

> The proposition that the courts must give "due weight" raises the question of how *much* weight is "due." We held in *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir.1987), that "[h]ow much deference to give state educational agencies ... is a matter for the discretion of the courts." Following a First Circuit decision, we held in *Gregory K.* that the courts are to consider the findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue," but the court "is free to accept or reject the findings in part or in whole." *Id.* (quoting *Town of Burlington v. Department of Education*, 736 F.2d 773, 792 (1st Cir.1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).
>
> When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are "thorough and careful." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.1994).

*Capistrano Unified School Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (alterations in original).

Thus, judicial review of IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to

14

the administrative record and are held to a highly deferential standard of review.

*Ojai*, 4 F.3d at 1471.  The IDEA does not empower a court to substitute its own

notion of sound educational policy for that of the school authorities that the court

reviews.  *County of San Diego*, 93 F.3d at 1466; *Ojai*, 4 F.3d at 1472; *Gregory K.

v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987).  In recognition of the

expertise of the administrative agency, the court must consider the findings

carefully and endeavor to respond to the hearing officer's resolution of each

material issue.  After such consideration, the court is free to accept or reject the

finding in whole or in part.  *County of San Diego*, 93 F.3d at 1466; *Gregory K.*,

811 F.2d at 1311.  Despite its discretion to reject the administrative findings after

carefully considering them, a court is not permitted simply to ignore the

administrative findings.  *County of San Diego*, 93 F.3d at 1466; *Gregory K.*, 811

F.2d at 1311.

   The burden in this proceeding is on the DOE, the party challenging

the administrative ruling.  *Seattle School Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498

(9th Cir. 1996) ("As the party challenging the administrative ruling, the School

District . . . had the burden of proof in district court.").

## IV. <u>ANALYSIS</u>

The DOE presents three arguments.  First, it argues that the Hearing Officer erred in focusing on R.L.'s "Specific Learning Disability" instead of on R.L.'s "Emotional Disturbance."  Second, the DOE argues that the Hearing Officer erred in considering and relying upon a draft neuropsychological evaluation prepared by Peggy Murphy-Hazzard, Psy.D. (R.L.'s Psychologist).  Third, the DOE argues that the Hearing Officer erred in imposing equitable remedies.  The court rejects the DOE's first two arguments, but remands to the Hearing Officer for a more thorough consideration of the appropriate compensatory education remedies in this case.  The court also concludes that the Hearing Officer erred in requiring the DOE to reimburse R.L.'s parents for their expert witness fees, and the court reverses this portion of the Decision and remands to the Hearing Officer to determine whether the psychological evaluation of R.L. is an impermissible expert witness fee or whether reimbursement for the evaluation is permissible under the IDEA.

As an initial matter, the court finds that -- with one exception -- the Hearing Officer's Decision is thorough and thoughtful, both in its factual findings and legal analysis.[9]  The Decision examines R.L.'s condition and history at length,

---

[9] As discussed more fully *infra*, the Decision was deficient in that it did not set forth specific findings regarding the award of compensatory education.

applying the IDEA and relevant caselaw in a reasoned manner.  The Decision

explains technical terms and pauses to note testimonial discrepancies.  *See*, *e.g.*,

Decision at 12 & n.6 (explaining that R.L. had a history of "Chronic Otitis

Media," commonly known as chronic ear infection); *id.* at 15, n.12 (discussing the

reliability of IQ test scores).  The court, in its discretion, accords substantial

weight to the Hearing Officer's Decision.  Furthermore, the court has conducted

an independent review of the record and agrees with all of the Hearing Officer's

factual findings.

A.    <u>Emotional Disturbance</u>

          The DOE's primary argument in its briefing, while not well

articulated, appears to be this:  the DOE believed (and continues to believe) that

R.L. was entitled to special education services because he had an "Emotional

Disturbance"; the DOE's March 3, 2005 IEP, according to the DOE, was designed

to address this Emotional Disturbance, and the Hearing Officer erred by ignoring

R.L.'s Emotional Disturbance in her Decision, by failing to consider the ways in

which the DOE was attempting to address R.L.'s Emotional Disturbance, and by

adopting R.L.'s parents' view that the IEP was deficient in failing to adequately

address the root cause of R.L.'s problems (his learning disabilities).

The DOE's argument is without merit.  The Hearing Officer concluded that the DOE failed to properly evaluate R.L.; whereas the DOE believed that R.L.'s primary problem was behavioral, the Hearing Officer found that R.L.'s behavioral problems stemmed from his frustration with having a learning disability.  In other words, the Hearing Officer found that the DOE's educational plan for R.L. incorrectly assumed that an emotional disturbance led to academic deficiencies, the DOE failed to properly evaluate R.L., and the DOE failed to offer R.L. a FAPE.  Thus, according to the Hearing Officer, the DOE should have been focusing on R.L.'s learning disabilities rather than on his behavioral problems.  With full support in the record, and in her detailed, reasoned Decision, the Hearing Officer found that the DOE simply "got it wrong."  Based on the Hearing Officer's thorough analysis, and based on the court's independent review of the record, the court finds that the DOE failed to properly evaluate R.L. and that this failure resulted in a denial of FAPE.

The Hearing Officer concluded that the DOE had not done enough to address R.L.'s range of issues and had not offered R.L. a FAPE.  The Decision states that

> [t]he goals and objectives in the March 3, 2005 IEP are
> identical to the goals and objectives in the December 2, 2004
> IEP, in spite of the Student's re-evaluation and psychiatric

> evaluation.  The Home School Vice-Principal testified that the
> December 2, 2004 IEP and BSP [Behavioral Support Plan]
> weren't working.  As such, Student has an IEP that does not
> work for him.

Decision at 23.  The Hearing Officer recognized the complexity of R.L.'s case and

the fact that his academic and emotional issues were intertwined:  "The problem

was not that Student was lazy, or merely acting defiant and oppositional.  In fact,

Student was suffering from undiagnosed learning disabilities and severe, recurrent

major depression.  The credible evidence presented by Petitioners showed how

Student's behaviors were a by product of the helplessness, anxiety, and frustration

he felt due to his learning disabilities."  Decision at 22.

In sum, the court accords substantial weight to the Hearing Officer's

findings and conclusions.  Based on an independent review of the record, the court

finds that the DOE failed to properly evaluate R.L. and that this failure led to a

denial of FAPE.

The DOE's principal argument in its briefing does not even appear to

address this ultimate conclusion regarding the DOE's deficient evaluation,

however.  Instead, the DOE's briefs argue that the Hearing Officer's *reasoning*

was flawed because she did not consider R.L.'s Emotional Disturbance and did not

consider the ways in which the DOE was addressing R.L.'s Emotional

Disturbance. This is argument is simply incorrect. The Hearing Officer's

Decision contains an extensive recitation of R.L.'s emotional problems: the

Decision reveals an understanding of R.L.'s initial categorization of "Specific

Learning Disability" and subsequent categorization of "Emotional Disturbance."

*See*, *e.g.*, Decision at 15 ("The IEP team considered specific learning disability

and emotional disturbance. According to the Multi-Agency Care Coordinator,

Student's emotional concerns were his primary barrier to learning. Anger and

depression were [R.L.'s] main problems[.]"); Decision at 22 ("On October 23,

2003, Student's special education eligibility was changed from specific learning

disability to emotional disturbance . . . . Petitioners claim that no IEP was

prepared for Student after his eligibility was changed to emotional disturbance.

No evidence to the contrary was presented[.]"); *id.* ("In spite of a history of

behavioral issues in school and his current classification under emotional

disturbance, Student's IEP did not contain mental health goals."); *id.* ("An IEP

was created for Student's 8th grade year on March 16, 2004. Student's disability

was emotional disturbance, however, the IEP did not contain any mental health

goals.").

   The Hearing Officer understood the full range of R.L.'s issues; she

simply gave greater weight to the testimony of R.L.'s Psychologist and other

witnesses who stated that the DOE's IEP was not working.[10]  The DOE's argument

that the Hearing Officer failed to analyze DOE's "approach" to R.L. is thus

without merit:  inherent in her Decision was a consideration and rejection of the

DOE's argument that it was adequately addressing R.L.'s needs.  The Hearing

Officer concluded that the DOE had -- over the course of several years -- failed to

provide R.L. with an IEP that would provide him with some educational benefit.

The DOE had its chance to offer R.L. a FAPE, and although the DOE continued to

modify R.L.'s IEPs, R.L.'s parents were not required to wait until the DOE

determined the true cause of R.L.'s learning disabilities.

      Even if the Hearing Officer's reasoning was flawed, however, the

DOE has not demonstrated how this flaw would entitle it to relief.  The ultimate

question in this case is not whether the Hearing Officer used the proper framework

for analyzing R.L.'s educational program.  Instead, the issue is whether the DOE

offered R.L. a FAPE -- that is, whether the various IEPs developed by the DOE

---

[10]  The court recognizes that the Hearing Officer overstates the similarities between the March 16, 2004, December 2, 2004, and March 3, 2005 IEPs.  For example, the December 2, 2004 IEP increased R.L.'s special education from 220 minutes a week to 600 minutes a week and added mental health goals.  The March 3, 2005 IEP increased R.L.'s special education to 900 minutes a week.  Thus, there was undoubtedly some recognition on the part of the DOE that the existing program was not meeting R.L.'s needs.  In short, the Hearing Officer appears to have been a bit harsh on DOE in suggesting that DOE had been completely non-responsive to R.L.'s parents' requests.  Nevertheless, the Hearing Officer concluded that DOE's efforts essentially addressed the wrong problem and thus were not likely to provide R.L. with any meaningful educational benefit.

were reasonably calculated to provide R.L. with educational benefits.  The DOE, in its briefs, does not argue that the March 3, 2005 IEP (or the March 16 or December 2, 2004 IEPs) offered R.L. a FAPE; it argues only that the Hearing Officer erred in failing to consider that the March 3, 2005 IEP was designed to address R.L.'s Emotional Disturbance.

The DOE has the burden of demonstrating that the Hearing Officer's Decision was erroneous,[11] but the DOE has provided this court with no argument or evidence to suggest that it offered R.L. a FAPE.  Instead of focusing on whether the IEP was an offer of FAPE, the DOE urges this court to rule that the Hearing Officer's reasoning was flawed.  The DOE's argument misses the mark -- the issue, once again, is whether the DOE was providing R.L. with the services he needed.  The DOE is correct that R.L. "was dealing with much more than a

---

[11] The Hearing Officer stated that the DOE had the burden of proof in the administrative proceeding, and this was a correct statement of the law at the time of the hearing.  After the Hearing Officer issued her Decision, however, the Supreme Court decided *Schaffer ex rel. Schaffer v. Weast*, 126 S.Ct. 528, 537 (2005), in which the Court held that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." In other words, had the administrative proceeding taken place after *Schaffer*, the burden of proof would have been on R.L. and his parents, not the DOE.  The DOE does not argue that this issue necessitates reversal of the Hearing Officer's Decision.  Furthermore, the record is clear that even if the burden had been on R.L. and his parents throughout the administrative proceeding, R.L. would have prevailed.  The Hearing Officer's Decision contains detailed and extensive findings of fact and conclusions of law indicating that, from her perspective, this was not a close case. The court agrees with the Hearing Officer -- this is not a close case.  As discussed *supra*, the court finds that, even if *Schaffer* applies retroactively, R.L.'s parents met their burden and proved that the DOE failed to offer R.L. a FAPE.

specific learning disability during his time in the public school system."

Plaintiff's Opening Brief at 22-23.  Nevertheless, even if the Hearing Officer

overemphasized the importance of R.L.'s learning disabilities (at the expense of

his Emotional Disturbance), there is no doubt that the Hearing Officer examined

the entire range of R.L.'s academic and emotional problems.  The DOE simply has

not provided the court with any reason to believe that the Hearing Officer's

ultimate conclusion is flawed, and the court rejects the DOE's argument on this

point.

//


B.     Draft Neuropsychological Evaluation

           The DOE next argues that the Draft Neuropsychological Evaluation,

prepared by Peggy Murphy-Hazzard, Psy.D. (R.L.'s Psychologist), was not

objectively trustworthy because it was incomplete, unreliable, and irrelevant.

Plaintiff's Opening Brief at 14.  The DOE therefore contends that the Hearing

Officer erred in relying on this report.

           This argument is without merit.  Dr. Murphy-Hazzard testified that,

although the report was not final, she had completed her testing of R.L. and the

Draft Neuropsychological Evaluation was a good indication of R.L.'s abilities and

disabilities.  Tr. Vol. 5 at 939.  She further testified that the final report would

include a more comprehensive history, and would include more information about

R.L.'s behavior and the tests she conducted.  *Id.* at 939-40.  The DOE had a full

opportunity to cross-examine Dr. Murphy-Hazzard.  *Id.* at 982-1042, 1046-55.

The DOE questioned Dr. Murphy-Hazzard as to whether her opinions could

change in her final report, and Dr. Murphy-Hazzard testified that her opinions

regarding R.L. would not change -- she would simply discuss her opinions in

greater detail in the final report.  The Hearing Officer did not err in considering

this draft report.

Furthermore, even if the Hearing Officer somehow erred in

considering this draft report, the DOE has provided no evidence or argument to

suggest that it was harmed in any way -- or is entitled to relief for any reason -- as

a result.  The DOE has failed to demonstrate that it offered to provide R.L. with a

FAPE, so even if the Hearing Officer was mistaken in considering the draft report,

there is nothing to suggest that the proper remedy is reversal of the Decision.  In

short, the DOE's argument is without merit.

C.     Equitable Remedies

The DOE's final arguments concern the appropriateness of the

equitable remedies imposed by the Hearing Officer.  The Hearing Officer ordered

the DOE to pay for three and one-half years of private school tuition (from January 2005 until June of 2008, when R.L. will likely graduate from high school). Decision at 26.  The DOE argues that the Hearing Officer's award should be reversed -- or at least curtailed -- for two reasons.  First, the DOE argues that there is no credible evidence establishing that private school tuition reimbursement is an appropriate equitable remedy.  Second, the DOE argues that the Hearing Officer exceeded her authority in awarding two years of *prospective* tuition reimbursement, inasmuch as the DOE could have developed (and is still capable of developing) a new IEP for R.L. to take him through the end of his high school career.

The DOE's first argument fails because there is credible evidence to support an award of tuition reimbursement.  As discussed *supra*, the DOE did not have a valid IEP in place between January 2005 and June 2006.  Furthermore, R.L.'s private school is an appropriate placement:  R.L.'s father testified that R.L. is doing well at his private school and that, although R.L. is still failing English, he is passing his other classes and has made friends -- a "complete turnaround" from his time at Kaiser.  Decision at 20; Tr. Vol 2. 4 at 858-60, 862.  A status report from R.L.'s private school, dated March 3, 2005, also demonstrated that R.L. was improving (though it indicated that R.L. still had a long way to go).

ARA Doc. # 15, Ex. 22.  One teacher wrote that R.L. "[s]tarted the quarter with a

bad attitude + not wanting to work.  This has changed and I'm seeing

improvements regularly." *Id.*  The Hearing Officer essentially concluded that the

DOE was either unable or unwilling to offer a FAPE to R.L., that R.L. could

receive an educational benefit at the private school, and that the most appropriate

remedy in this case was to require the DOE to pay for R.L.'s private school tuition.

There is evidence to support these conclusions.  The Hearing Officer heard

testimony over six days and wrote a reasoned twenty-seven page Decision, and her

conclusion is entitled to substantial deference by this court.

        The DOE's second argument was not articulated until the May 22,

2006 hearing:  the attorney appearing for the DOE at the hearing was not the same

attorney who prepared the DOE's briefs, and the DOE's new counsel changed the

focus of the DOE's argument.  The new counsel for the DOE recognized that it

would be difficult for this court to overturn the Hearing Officer's conclusions

regarding the denial of FAPE; counsel also recognized that if the court found that

the DOE had denied R.L. a FAPE, reimbursement of private school tuition for the

period January 2005 through June 2006 would be a proper remedy.  *See* Plaintiff's

Supplemental Brief at 9.  The court agrees that tuition reimbursement for the

period January 2005 through June 2006 is appropriate:  there is overwhelming

evidence that the DOE failed to offer R.L. a FAPE during this time period, and tuition reimbursement is the proper remedy.  Consequently, R.L.'s parents are entitled to reimbursement for private school tuition during that time period.

The DOE's real concern, however, is with the Hearing Officer's award of two years of compensatory education (to be applied prospectively to R.L.'s private school tuition for the 2006-2007 and 2007-2008 school years).  The DOE argues that the Hearing Officer did not make sufficient findings to justify the two years of compensatory education; the DOE further argues that the two-year statute of limitations[12] precludes this award of compensatory education.

The DOE is correct that there is a difference between tuition reimbursement and compensatory education:  although R.L. was entitled to tuition reimbursement from January 2005 to June 2006 because the DOE failed to provide him with a FAPE during that time period, the fact that R.L. was denied a FAPE

_____

[12] The parties agree that a two-year limitations period applies to this case.  *See Dep't of Educ. v. E.B.*, Civ. No. 05-00543, 2006 WL 1343681, *4 n.7 (D. Haw. May 15, 2006) (collecting cases applying two-year statute of limitations).  The court also notes, however, that the IDEA was amended effective July 1, 2005 -- after R.L.'s parents filed their request for a due process hearing -- and now provides that "[a] parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows."  20 U.S.C. § 1415(f)(3)(C).  Also in July 2005, Hawaii Revised Statutes (HRS) § 302A-443 was amended to provide for a two-year limitations period in most IDEA cases but a ninety-day limitations period in the type of case presented by the instant dispute (where the parents unilaterally place the student in a private school and institute a due process hearing to seek reimbursement for the placement).

27

does not necessarily mean that R.L. was entitled to two years of compensatory education.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the [public] agency to reimburse the parents for the cost of [private school] enrollment if the court or hearing officer finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment."); 20 U.S.C. § 1415(i)(2)(C) ("[T]he court . . . shall grant such relief as the court determines is appropriate.").  As the Ninth Circuit has held, "[t]here is no obligation to provide a day-for-day compensation for time missed.  Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA."  *Parents of Student W. v. Puyallup School Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994).  In other words, the fact that R.L. was deprived of a FAPE for a year and a half does not automatically translate into an award of compensatory education for the same (or greater) period of time.

The DOE is also correct that the Decision does not explicitly set forth the reasons why specialized tutoring along with two years of compensatory education is the proper equitable remedy.  Although the Decision clearly sets forth R.L.'s educational difficulties and lack of educational progress at public school, the Decision fails to explain why two years of compensatory education plus tutoring, and not some lesser award, is justified.

28

Although compensatory education may be an appropriate remedy in this case, the Decision does not indicate why the amounts and types of compensatory education are necessary in this case. For example, although two years of compensatory education may be necessary to fully compensate R.L. for the DOE's failures,[13] the Decision does not explain why R.L. needs two years of compensatory education rather than some different remedy (other than that two years of compensatory education was the remedy requested by R.L.'s parents).

The Hearing Officer may, but need not, consider additional evidence on remand. The Hearing Officer may also consider whether the DOE has offered R.L. a FAPE for the 2006-2007 school year. If the Hearing Officer finds that R.L. was not offered a FAPE for the 2006-2007 school year, the Hearing Officer may

---

[13] The DOE argues that there is a statute of limitations problem here. The Hearing Officer found that because R.L. "was deprived of many years of educational opportunity," he was entitled to two years of compensatory education. The DOE argues that the Hearing Officer erred by holding the DOE liable for events that occurred more than two years prior to the request for a due process hearing on May 18, 2003. The DOE is correct that R.L. may only recover for those injuries incurred within the limitations period. *See Dep't of Educ. v. E.B.*, Civ. No. 05-00543, 2006 WL 1343681, *5 (D. Haw. May 15, 2006) ("[P]ursuant to the two-year statute of limitations, the Hearing Officer was not permitted to base any liability finding on events that occurred prior to February 18, 2003."). Nevertheless, "consistent with that statute of limitations, the Hearing Officer was permitted to consider those prior events for other purposes, such as to provide context to the events beginning on" May 18, 2003. *Id.* The record clearly demonstrates that the DOE deprived R.L. of a FAPE between May 18, 2003 and late January of 2005. Even if the DOE cannot be held liable for events that occurred prior to May 18, 2003, however, the DOE is nevertheless liable for whatever compensatory education is required to make up for the DOE's failure to offer R.L. a FAPE from May 18, 2003 forward.

consider whether tuition reimbursement, rather than compensatory education, is

appropriate for that time period.

D.    Expert Witness Fees

         In addition to awarding R.L.'s parents tuition reimbursement and

compensatory education, the Decision also ordered the DOE to pay for the cost of

R.L.'s psychological evaluation as well as the Psychologist's expert witness fees

for testifying at the due process hearing.  Decision at 25.  After the parties

submitted their briefs and argued the case, however, the Supreme Court decided

*Arlington Central School District Board of Education v. Murphy*, No. 05-18, ___

S. Ct. ___, 2006 WL 1725053 (June 26, 2006).  The Court held that 20 U.S.C.

§ 1415(i)(3)(B) does not allow prevailing parents in IDEA actions to recover

expert witness fees.  Therefore, the Hearing Officer's award of the Psychologist's

expert witness fees is hereby REVERSED.

         Whether the Hearing Officer was entitled to award of the cost of

R.L.'s psychological evaluation is less clear.  The Hearing Officer awarded the

Defendants the cost of the psychological evaluation after finding that the DOE

failed to properly diagnose R.L.'s learning disabilities; thus, whether the

psychological evaluation itself was part of Dr. Murphy-Hazzard's expert witness

evaluation, or whether the evaluation was required to provide R.L. with an

appropriate education and is therefore reimbursable under the IDEA, is unclear.

Therefore, the court REMANDS the case to the Hearing Officer to determine

whether the psychological evaluation of R.L. is an impermissible expert witness

fee or whether reimbursement for the evaluation is permissible under the IDEA.

## V.  <u>CONCLUSION</u>

Based on the foregoing, the court AFFIRMS the Hearing Officer's

Decision regarding the denial of FAPE and tuition reimbursement.  No later than

August 4, 2006, the DOE shall reimburse R.L.'s parents for R.L.'s private school

tuition for the period January 2005 through June 2006.  The court REVERSES the

Hearing Officer's award of expert witness fees.  The court REMANDS this case to

the Hearing Officer for specific findings consistent with this Order.  The court

DENIES the Defendants' request for attorney's fees without prejudice as

premature.

The Clerk of the Court is directed to remand this action back to the

Hearing Officer and close this case.  The Clerk of the Court shall send a copy of

this Order to all the parties in this action, as well as to the Hearing Officer,

Haunani H. Alm.

If any party wishes to appeal the Hearing Officer's amended decision, it may do so by:  (1) filing a notice of appeal along with an ex parte motion to reopen this case along with a brief supporting the appeal; and (2) filing any

\\

\\

\\

\\

\\

\\

\\

additional documents relevant to the disposition of this case.  The parties need not re-file any documents or transcripts that are already a part of the record.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 7, 2006.

J. Michael Seabright
United States District Judge

*Department of Education, State of Hawaii v. L.K. & W.L. on behalf of R.L.*, Civ. No. 05-00616 JMS/BMK, Order Denying In Part Plaintiff's Motion to Reverse Hearing Officer's Decision and Order and Remanding Case to Hearing Officer